Filed 9/28/23  P. v. Moody CA2/4

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B308495 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA445427) |
| v. | |
| TYRONE EUGENE MOODY, et al., | |
| Defendants and Appellants. | |

APPEAL from a Judgment of the Superior Court of California. Charlaine F. Olmedo, Judge. Affirmed in part as modified and reversed and remanded in part.

David Andreasen, under appointment by the Court of Appeal, for Defendant and Appellant Tyrone Eugene Moody.

Robert E. Boyce, under appointment by the Court of Appeal, for Defendant and Appellant Christopher Vargas.

Richard A. Levy, under appointment by the Court of Appeal, for Defendant and Appellant Frank Perez.

Rob Bonta, Attorney General of California, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill, David F. Glassman, and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Appellants Tyrone Eugene Moody, Christopher Vargas, and Frank Perez (collectively, "defendants") planned and carried out the robbery of a taxi driver, during which Vargas shot and killed the driver. All three appellants were jointly tried before two separate juries,[1] and all three were found guilty of first-degree murder (Pen. Code, § 187, subd. (a))[2] with a robbery-murder special circumstance finding (§ 190.2, subd. (a)(17)(A)) and second-degree robbery (§ 211). The juries also found true gang (§ 186.22, subd. (b)(1)(C)) and gang-principal firearm-use and discharge allegations (§ 12022.53, subds. (b)-(d), (e)(1)). Vargas's jury separately found him guilty of carrying an unregistered, loaded firearm (§ 25850) and found true a taxi driver special circumstance allegation (§ 190.25, subd. (a)).

On appeal, defendants assert insufficient evidence supports that they were major participants in the underlying robbery who acted with reckless indifference to human life. Defendants also argue that the trial court committed instructional error; erred in admitting hearsay statements; and committed sentencing errors.

_____

1       Moody and Perez shared one jury, while Vargas was tried before another jury.

2       All statutory references are to the Penal Code unless otherwise noted.

We affirm defendants' convictions, but remand for a retrial of the gang and firearm allegations.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

### A.    Defendants Plan a Taxi Robbery.

Perez and Abel Mesta were members of the Choppers 12 gang. Moody was part of a tagging crew known as "RG," and although the crew was associated with the Big Hazard gang, Moody did not belong to either Choppers 12 or Big Hazard. Vargas was not a member of the Choppers 12 gang but wished to join. At the time of the offenses, defendants and Mesta were all 18 to 20 years old.

In March 2016, Perez (aka "Droopy") lived with his mother, Lorraine "Shorty" Hernandez. Although Hernandez was also a Choppers 12 member, she did not live near the gang's territory. Instead, Hernandez's apartment was near Big Hazard territory. Choppers 12 was on good terms with Big Hazard. The gangs shared territory and on occasion committed crimes together. [3]

At the time of the offenses, Moody was also living at Hernandez's apartment. Hernandez permitted gang members to leave guns at the apartment.

On March 13, 2016, Mesta was at the apartment, along with Perez and Vargas. They were drinking and using drugs.

---

[3]    Hernandez was charged with accessory after the fact to murder (§ 32; count 2) with special allegations including a gang allegation. (§ 186.22, subd. (b)(1)(A).) Initially, Mesta was charged with robbery and the same gang and principal firearm discharge allegations as the other defendants. Hernandez and Mesta pleaded guilty and admitted the gang allegations; Mesta also admitted a principal-armed firearm allegation. They both testified at trial.

During the afternoon, Vargas and Perez wanted to obtain some money; Perez proposed a taxi robbery.

Mesta gave Vargas a .45 caliber handgun. The gun was a "gang gun" that was passed around among gang members. Perez had a .22 caliber rifle.[4]

Between 9:05 p.m. and 9:16 p.m., Vargas called a taxi service on his cell phone. Vargas, Moody and Perez left the apartment and went to meet the taxi.

### B.  The Robbery and Killing of Taxi Driver Antonio Paz.

*1.  The Shooting*

On March 13, 2016, Jose Gonzalez, the taxi dispatcher, received a call from Vargas's cellphone to pick up passengers at 4360 Worth Street in an industrial area of Los Angeles. The victim, cabdriver Antonio Paz, responded that he was nearby and would pick up the passengers. At 9:26 p.m., Paz told Gonzalez he had picked them up.

At about 9:34 p.m., police received a 911 call of a shooting at the corner of Worth and Indiana Streets. Police found Paz face down in the street about 20 feet from his taxicab. The taxi's engine was running, the headlights were on, and the keys were in the ignition. Paz had been shot in the head and in his left leg and

---

4  There was inconsistent testimony concerning the caliber and number of weapons the three defendants carried. Mesta and Moody described Perez's weapon as an "M-16," although the prosecution theorized it was likely a .22 caliber rifle. Moody had a .22 caliber handgun. Both .22 and .45 spent shell casings were found at the scene of the shooting.

was dead. Paz's shirt had been ripped open, and his wallet, cash, and phone were missing.

According to Hernandez's downstairs neighbor, the weapons used were a rifle larger than a .22, and a .38 or .45 caliber handgun.[5]

At 10:00 p.m., dispatcher Gonzalez received a call and was told that Paz had been the victim of a crime. Later that evening, Gonzalez searched social media using the phone number used to summon the taxi and connected it to Vargas.

### 2. Police Investigation and Forensics.

Police found a .45 caliber shell casing on the driver's seat of the taxicab. Two .22 caliber casings were located by the driver's side door. An expended .45 bullet and shell casing were discovered near Paz's head in the street. Police also found two live firecrackers, on the taxi's center console and one on the passenger seat, and spent firecracker paper under the taxi.

Vargas's palm print was found on the outside rear passenger window of the taxi.

Paz died from a gunshot to the head. A bullet entered the back of his head on the left side and exited the top of his forehead on the right side. The gun had been fired within one foot of Paz's head. The wound to Paz's leg indicated that the bullet entered from the front.

---

5 Moody fairly consistently identified the gun as a .38, although there was other testimony that the weapon was .45 caliber.

### 3. Moody, Vargas, and Perez return to Hernandez's Apartment.

Shortly after the robbery, Moody, Perez, and Vargas returned to Hernandez's apartment. They told Mesta they had pistol-whipped the driver with the .45 and the gun went off. Mesta understood this to mean the gun had accidentally gone off. Although Moody and Perez had about $250, they did not give any of it to Mesta.

Around 9:45 p.m. that night, Hernandez took a rifle, handgun, and a bulletproof vest to her downstairs neighbor, Robert Vega. She told Vega it was an emergency and they needed to hide the guns. Hernandez and two other people put the guns under Vega's mattress and Hernandez told him they had hit a taxi driver. Hernandez retrieved the guns two days later.

Mesta did not believe that Moody, Perez, or Vargas were "putting in work" for a gang when they committed the robbery, nor did he believe any other gang members received the money from the robbery.

### 4. Surveillance Videos.

Surveillance cameras near Hernandez's apartment showed three individuals leaving the apartment at 9:24 p.m. A nearby casket factory security camera showed three people running from the crime scene toward Hernandez's apartment. They returned to the apartment at 9:35 p.m. At about 9:41 p.m., police arrived at the crime scene. At around 9:45 p.m., Hernandez went to Vega's apartment.

### 5. *Defendants' Arrest.*

Perez was arrested in Mexico on April 10, 2016 and extradited. Moody was arrested on April 20, 2016. Vargas was arrested on May 17, 2016.

Hernandez was interviewed on March 30, 2016 and admitted to police that she was a Choppers 12 member and was known as "Shorty."

## C.    The *Perkins* Operation.

A day after Moody's arrest, police conducted a *Perkins* operation.[6] Moody was put in a cell with an undercover officer posing as an inmate and the following conversation was covertly recorded.

The undercover agent asked Moody "[w]here you from?" and Moody responded that he did "not bang." Moody later admitted he was trying to join the Big Hazard gang and had put in some work to do so.

Moody described the events of the night of the murder. Perez had let Moody move into his mother's apartment when Moody was kicked out of his own home. Moody had spent the day of the robbery at a park drinking alcohol. That evening, when he got back to the apartment, Perez and Vargas told him they were going to "'do some . . .'" Moody did not know Vargas. Moody claimed he just went along to look out for his friend Perez.

---

6    In a *Perkins* operation, an undercover operative, who the suspect does not know is a police agent, is placed in a cell with the suspect. (*Illinois v. Perkins* (1990) 496 U.S. 292, 294 (*Perkins*).)

7

Moody told the undercover agent about the robbery. Moody had given Vargas a .38 snub nose handgun[7] and Perez had an M16. Moody claimed he was not armed. Perez hid in the bushes and when the taxi arrived, Moody got in the passenger seat, while Vargas got in the rear behind the driver.

Vargas put the gun to the driver and told him to "give me everything." Moody went through the driver's pockets, took his wallet and cell phone, and threatened the driver, telling him "if you want to see your kids don't do nothing." The driver had $160 and $3000 pesos. The driver tried to call 911 and Perez emerged from the bushes with the M16.

Moody told Vargas to "knock out" the driver, and Vargas began to pistol whip the driver. Moody lit some firecrackers as a cover for the gunshot noise.

The driver got out the taxi and tried to run. Moody grabbed him, and put him in the trunk. Because that would be kidnapping, Moody suggested that Vargas knock him out. Vargas began to pistol whip Paz again, but then shot Paz in the head According to Moody, Vargas fired four shots at the taxi driver.

The three defendants fled back to the apartment. A week later, Moody heard that Vargas had been caught because the police traced his phone. Moody and Perez planned to kill Vargas because he snitched.

Moody told the *Perkins* operative that Vargas was a "dumbass" and a "weird ass dude." Moody was angry with Vargas because Vargas had identified Moody to the police.

---

7    This testimony is inconsistent with previous testimony that Vargas had a .45.

**D. Vargas's Two Interviews with Police.**

Police first interviewed Vargas on March 15, 2016. After being given *Miranda* warnings, Vargas denied killing anyone and denied being with anyone when a cab driver was robbed and killed. He denied calling for a taxicab. No one told Vargas they were going to use his phone to call a taxi. Vargas claimed Mesta borrowed his cellphone the night of the shooting and returned it the next morning.

Following his release from custody, Vargas was rearrested on May 17, 2016. After conducting a separate *Perkins* operation, police interviewed Vargas a second time,[8] and Vargas told them he had known Perez for about two weeks, but only met Moody once before the crime. Mesta introduced Vargas to Perez and Moody. Vargas stated he was present during the discussion at Hernandez's apartment planning the robbery. Vargas claimed Mesta called the taxi using Vargas's phone.

Vargas went with Moody and Perez to meet the cab. Moody pulled out a gun and asked the driver to give him money. Vargas hit the driver on the head with the gun he had been given at the apartment, and it accidentally went off. As Vargas ran off, he heard another gunshot. Later, Moody gave Vargas $50. Vargas bought a gun because he was scared his eventual co-defendants would kill him. He was carrying this gun when he was rearrested.

Police showed Vargas a six-pack photo array, from which Vargas identified Mesta, Moody, and Perez.

---

8    An audiotape of the first and second interviews was played for the jury.

### E.  Mesta's Testimony.

Mesta, who was initially charged as a co-defendant, pleaded to robbery and admitted the gang and firearm allegations. He did not have a plea agreement and did not want to testify.

Mesta was a member of the Choppers 12 gang and was known as "Sinner." Mesta knew Perez as "Droopy." Mesta did not believe defendants were committing the robbery for the benefit of a gang. Mesta gave a .45 gang gun to Perez, who passed it to Vargas.

When the group returned from the robbery, Vargas told them he had "killed someone." Vargas told Mesta the gun went off accidentally. Mesta believed he saw a gun in Vargas's waistband but did not know the caliber.

After Mesta was arrested on March 30, 2016, he told an undercover *Perkins* agent that he believed the co-defendants were "flipping" (turning) on him.

### F.  Gang Testimony.

Michael Deschamps, a sheriff's deputy detective, testified as a gang expert that Choppers 12 was a criminal street gang with about 50 members. Choppers 12's principal activities included vandalism, graffiti, possession of narcotics for sale, illegal firearm possession, assault with a deadly weapon, extortion, witness intimidation attempted murder, and murder. A Los Angeles Police Department (LAPD) officer testified that Big Hazard was also a criminal street gang. These experts opined that the taxi robbery was committed for the benefit of the Choppers 12 and Big Hazard gangs.

According to Deschamps, the robbery was committed in association with the Choppers 12 gang because Perez "the more established Choppers 12 gang member was acting in association with the gang partly so 'he can validate that new guy put[ting] in the work.'" "An individual who was trying to join Choppers, along with a validated member who would act as a witness to tell the rest of the gang that the person trying to join had 'put in the work.'" Deschamps opined the crime would benefit Choppers 12 because it would bring notoriety to the gang, and the proceeds would boost the gang's operations and help the relationship between Big Hazard and Choppers 12. However, Deschamps had not heard of an instance where Big Hazard and Choppers 12 gang members had committed a crime together.

LAPD Officer Juan De La Riva testified as an expert on Big Hazard. The gang had about 300 members. He believed the robbery had been committed in association with Big Hazard because it was easier for gang members to commit crimes in groups, as there was "strength in numbers." Big Hazard would benefit from the valuables taken. However, de la Riva did not know of an instance where the two gangs committed a crime together.

Martin Flores testified as a gang expert on behalf of defendants. He was familiar with both Choppers 12 and Big Hazard. For someone to join a gang, a gang member must be present to evaluate the crime. Crimes are specifically designed for initiation purposes. However, Flores believed it was unlikely vetting crime for one gang would be committed in another gang's territory.

Further, Flores believed members of one gang would not put in work for another gang. The mere fact members of different

gangs committed a crime together did not indicate an alliance between gangs. Such an alliance would need to be decreed from the top level of the gang. Flores opined that the robbery and shooting of Paz was not for the benefit of Choppers 12. Rather, the crime was committed by "four people who happen to know each other, but not specifically a gang or a tagging crew or a non-gang."

## G.    **Information, Verdict and Sentencing**.

The amended information jointly charged Vargas, Moody, and Perez with murder (§ 187, subd. (a)) (count 1) and second degree robbery (§ 211) (count 5). Vargas was also charged with carrying an unregistered firearm (§ 25850, subd. (a)) (count 4).

A robbery-murder special circumstance allegation and a taxi driver special circumstance allegation was alleged against all three defendants. (§§ 190.2, subd. (a)(17), 190.25, subd. (a).)

As to the murder and robbery counts, it was further alleged the crimes were committed for the benefit of, at the direction of, and in association with a criminal street gang. (§ 186.22, subd. (b)(1)(C).) As to Moody and Perez, it was further alleged that a principal personally discharged a firearm proximately causing death, and as to Vargas, it was further alleged that he personally and intentionally discharged a firearm proximately causing death. (§ 12022.53, subds. (b)-(e)(1).)

Defendants were tried together before two juries, the "yellow" jury for Vargas and the "blue" jury for Moody and Perez. The juries found defendants guilty of first-degree murder with a robbery-murder special circumstance finding. The juries also found them guilty of second-degree robbery. Vargas was found guilty of carrying an unregistered, loaded firearm. As to Moody and Perez, all special allegations were found true. As to Vargas,

12

the jury found the gang and personal firearm discharge allegations to be not true but found the remaining allegations (taxi driver special circumstance and personal firearm use) to be true.

The trial court imposed life without the possibility of parole for Perez and Moody on count 1, plus 25 years to life for the principal firearm discharge enhancement. The court imposed but stayed punishment for the robbery on count 5. The court imposed life without the possibility of parole for Vargas on count 1, plus 10 years for the personal firearm use enhancement. The court imposed a concurrent sentence on count 4 (carrying unregistered firearm) and imposed but stayed punishment for the robbery.


## DISCUSSION

## I. SUFFICIENT EVIDENCE SUPPORTS MOODY'S AND PEREZ'S FELONY MURDER CONVICTIONS ON A THEORY THEY WERE MAJOR PARTICIPANTS WHO ACTED WITH RECKLESS INDIFFERENCE TO HUMAN LIFE

Both Moody and Perez were convicted on a theory of felony murder as major participants who acted with reckless indifference to human life. They contend insufficient evidence supports these findings.[9] (See § 190.2, subd. (d); *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*); *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*).) We disagree.

---

9    Moody solely challenges the reckless indifference element, while Perez challenges both elements.

13

### A.    Standard of Review.

In evaluating a challenge to the sufficiency of the evidence, we ask "'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (*People v. Edwards* (2013) 57 Cal.4th 658, 715, original italics (*Edwards*).) Because the sufficiency of the evidence is ultimately a legal question, we examine the record in the light most favorable to the judgment and independently for "'substantial evidence—that is, evidence which is reasonable, credible, and of solid value'" that would support a finding beyond a reasonable doubt. (*People v. Boyce* (2014) 59 Cal.4th 672, 691.)

### B.    Legal Principles

#### 1.    *Felony Murder Special Circumstance, Section 190.2, Subdivision (a)(17).*

In California, the felony-murder rule provides an exception to the malice requirement for murder. (*People v. Solis* (2020) 46 Cal.App.5th 762, 774.) The rule imputes the requisite malice to those who commit a homicide during the perpetration of a felony inherently dangerous to human life. (*People v. Cruz* (2020) 46 Cal.App.5th 740, 752.) The necessary mental state is simply the specific intent to commit the underlying felony. (*People v. Cavitt* (2004) 33 Cal.4th 187, 197.)

Proposition 115, enacted in 1990, extended the death penalty to felony murders. (§ 190.2, subd. (d); *Banks, supra,* 61 Cal.4th at p. 794.) The felony-murder special circumstance applies to murders committed in the course of the most serious felonies, including robbery, rape, arson, carjacking, and first or second degree burglary. (§ 190.2, subd. (a)(17).) Like the other

14

special circumstances, the felony-murder special circumstance applies to defendants who actually killed or who abetted a murder with the intent to kill. (§ 190.2, subds. (b) & (c).) The defendant must be a major participant who possesses a reckless indifference to life. (§ 190.2, subd. (d).) "[U]nlike the other special circumstances, the felony-murder special circumstance also applies to some convicted murderers who neither killed nor intended to kill, namely, 'major participant[s]' in the underlying felony who acted 'with reckless indifference to human life.'" (*People v. Strong* (2022) 13 Cal.5th 698, 704; § 190.2, subd. (d).) In *Banks,* our Supreme Court concluded this language in the statute imposed both an actus reus requirement (major participant) and a mens rea requirement (reckless indifference). *(Banks, supra*, at p. 798.)

2. *Meaning of "Major Participant" and "Reckless Indifference."*

*Banks, supra,* 61 Cal.4th 788, and *Clark, supra,* 63 Cal.4th 522, delineated the meaning of "major participant" and "reckless indifference." *Banks* focused primarily on the factors necessary to be a "major participant," while *Clark* addressed the "reckless indifference" requirement. (*People v. Strong, supra,* 13 Cal.5th at p. 706.)[10] Ultimately, as discussed below, the two cases endorse

10    Senate Bill No. 1437 (2017-2018 Reg. Sess.) amended the felony-murder rule and the natural and probable consequences doctrine, as it relates to murder, "to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) Senate Bill No. 1437 achieved these goals by amending section 188 to require that a

15

the same factors to evaluate the defendant's conduct and mental state.

*Banks* found that although revised section 190.2, subdivision (d), did not define "major participant," the statute mirrored two United States Supreme Court cases, *Tison v. Arizona* (1987) 481 U.S. 137 [107 S.Ct. 1676, 95 L.Ed.2d 127] (*Tison*) and *Enmund v. Florida* (1982) 458 U.S. 782 [102 S.Ct. 3368, 73 L.Ed.2d 1140] (*Enmund*). (*Banks, supra*, 61 Cal.4th at p. 794.) *Banks* concluded that these cases were placed on a spectrum and permitted imposition of the death penalty only when defendants' "involvement is substantial and they demonstrate a reckless indifference to the grave risk of death created by their actions." (*Ibid.*)

---

principal act with express or implied malice (§ 188, as amended by Stats. 2018, ch. 1015, § 2), and by amending section 189 to state that a person can be liable for felony murder only if: (1) the "person was the actual killer"; (2) the person, with an intent to kill, was an aider or abettor in the commission of murder in the first degree; or (3) the "person was a major participant in the underlying felony and acted with reckless indifference to human life." (§ 189, subd. (e), as amended by Stats. 2018, ch. 1015, § 3.) In *Strong*, the Supreme Court held "[f]indings issued by a jury before *Banks* and *Clark* do not preclude a [petitioner] from making out a prima facie case for relief under Senate Bill [No.] 1437. This is true even if the trial evidence would have been sufficient to support the findings under *Banks* and *Clark*." (*Strong, supra*, 13 Cal.5th at p. 710.) The Supreme Court concluded, "*Banks* and *Clark* both substantially clarified the law governing findings under . . . section 190.2, subdivision (d): *Banks* elucidated what it means to be a major participant and, to a lesser extent, what it means to act with reckless indifference to human life, while *Clark* further refined the reckless indifference inquiry." (*Strong* at pp. 706–707.)

As *Banks* observed, in *Enmund*, at one end of the spectrum, the defendant took part in a robbery that resulted in the killing of two victims. (*Banks, supra,* 61 Cal.4th at pp. 799–800.) The defendant's participation was limited to driving the getaway vehicle, and there was no evidence he committed the killing, was present at the killing, or participated in the underlying planning of the robbery. (*Banks, supra,* 61 Cal.4th at p. 799.) As a result, *Enmund* held he could not constitutionally be subject to the death penalty. (*Ibid.*) In contrast, in *Tison*, at the other end of the spectrum, the defendant participated in an armed jail break, during which the defendants' car broke down, and defendants took a family of four hostage in order to steal their car, drove to the desert, and killed the family. (*Ibid.*)

*Banks* noted that *Tison* recognized these two extremes of culpability—ranging from the defendant who was a "'minor actor, . . . not at the scene, who neither intended to kill nor was found to have had any culpable mental state,'" to "actual killers and those who attempted or intended to kill." (*Banks, supra*, 61 Cal.4th at p. 800.) As *Banks* concluded, "[s]omewhere between them, at conduct less egregious than the Tisons' but more culpable than . . . Enmund's, lies the constitutional minimum" showing required for the imposition of death or life without the possibility of parole. (*Id.* at p. 802.)

Applying these principles, *Banks* found "[a] sentencing body must examine the defendant's *personal* role in the crimes leading to the victim's death and weigh the defendant's individual responsibility for the loss of life, not just his or her vicarious responsibility for the underlying crime." (*Banks, supra*, 61 Cal.4th at p. 801, original italics.) *Banks* then set forth the factors to consider in evaluating whether the defendant was a

17

major participant and exhibited reckless indifference to human life: (1) the defendant's role in planning the criminal enterprise that led to one or more deaths; (2) the defendant's role in supplying or using lethal weapons; (3) the defendant's awareness of the particular dangers posed by the nature of the crime, the weapons used, or the past experience or conduct of the other participants; and (4) whether the defendant was present at the scene of the killing, in a position to facilitate or prevent the actual murder, or played a particular role in the death. (*Id.* at p. 803.) "No one of these considerations is necessary, nor is any one of them necessarily sufficient. All may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major.'" (*Ibid*.)

*Clark, supra,* 63 Cal.4th 522, observed that "'reckless indifference,'" the mens rea requirement, has "subjective and objective elements." (*Id.* at pp. 616-617.) "The subjective element is the defendant's conscious disregard of risks known to him or her," while the objective element considers "what 'a law-abiding person would observe in the actor's situation.'" (*Ibid*.) *Clark* identified the following factors, many of which overlap with the *Banks* factors, as pertinent to whether a defendant acted with reckless indifference to human life: (1) the defendant's knowledge that weapons would be used and/or his personal use of weapons; (2) the defendant's physical presence at the scene and his opportunity to restrain the crime or aid the victim; (3) the duration of the felony; (4) the defendant's knowledge of his accomplice's propensity to kill; and (5) the defendant's efforts to minimize the risk of violence in the commission of the felony. (*Clark* at pp. 618–623.)

18

As *Clark* noted, there is "'significant[ ] overlap'" between the "major participant" and "reckless indifference to human life" requirements because "'the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life.'" (*Clark*, *supra*, 63 Cal.4th at pp. 614–615.) However, *Clark* pointed out that a defendant who is merely involved in a first-degree felony murder does not automatically act with reckless indifference to human life. (*Id.* at p. 616.)

## C. Analysis.

Perez and Moody principally point to contradictions in the evidence to support their argument. However, there is sufficient evidence under the *Banks/Clark* factors to support the jury's verdict.

Moody argues that the evidence did not establish he acted with reckless indifference to human life. In support of his position, he emphasizes: (1) he did not personally possess or use a weapon during the robbery; (2) he had no forewarning Vargas would pistol whip Paz or shoot him; (3) as Paz attempted to flee, Moody tried to stop Vargas from shooting again; (4) once Paz was shot in the back of the head, there was not much Moody could do to render aid; (5) Moody's decision to flee the scene was "ambiguous" because it could either show he recognized that trying to render aid was useless, that he was indifferent, or that he panicked (which is what one would expect of someone who did not expect a shooting); and (6) his youth at the time of the offenses establishes he did not appreciate the risk or dangers.

Perez argues the evidence did not establish he acted with reckless indifference because he was not friends with Vargas and had no knowledge that Vargas would become violent. Perez also argues he had no realistic opportunity to restrain the crime

19

because he was hiding in the bushes; the robbery happened very quickly, lasting only "a few minutes[;]" he did not brandish or fire a gun (he allegedly carried an M16, and only .22 and .45 shell casings were found at the scene); he did not supply the murder weapon or know that a gun would be fired; once the driver was shot in the head at close range, "there was nothing anyone could do to save him[;]" and Perez's youth (age 19 at the time of the crime) establishes he lacked the executive functioning to assess risks and control impulses. Further, Perez contends he was not a major participant because he was not the mastermind of the crime who planned and organized the robbery or provided weapons; rather, Vargas had the lead role. Perez asserts he did not have a significant role as he was in the bushes, and his actions and inactions did not play a role in Paz's death.

However, contradictions in the evidence do not necessarily undermine the sufficiency of the evidence. Reversal on insufficiency of the evidence is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.) "If the circumstances reasonably justify [the] findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Jennings* (2010) 50 Cal.4th 616, 639.) Indeed, "[a]ppellate inquiry into the sufficiency of the evidence 'does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.' [Citation.] Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond

20

a reasonable doubt.' [Citation.] In other words, 'it is the jury, not the appellate court which must be convinced of the defendant's guilt . . . .'" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055–1056.)

The evidence is substantial that Moody and Perez were major participants who also acted with reckless indifference to human life:

(1) *Planning*. Perez was a central participant in planning the robbery with Vargas at Hernandez's apartment. Although Moody apparently arrived later (he told the *Perkins* agent he met Perez and Vargas as they were leaving Hernandez's apartment and asked to join them), an inference may be drawn that Moody participated in some planning because Moody acted in concert with the other two defendants when they met the taxi: Moody and Vargas got into the taxi and robbed Paz while Perez waited in the bushes. Finally, defendants brought fireworks with them to mask any potential gunfire.

(2) *Provision or use of lethal weapons*. The evidence was in conflict whether Moody was armed. Moody claimed he was not, while Mesta testified that Moody was armed with a .22 handgun. The jury was entitled to credit Mesta's testimony and ignore Moody's statements. Further, Moody told the *Perkins* agent that he gave a .38 gun to Vargas. Although Perez claims that he did not supply the murder weapon or know that a gun would be used, Mesta testified that he gave a .45 gun to Perez, who gave it to Vargas. Moody told the *Perkins* agent that Perez had an M16 riffle.

(3) *Awareness of the particular dangers posed by the nature of the crime, the weapons used, or the past experience or conduct of the other participants*. Both Perez and Moody claim they had no knowledge of Vargas's propensity for violence, asserting they did

21

not know him well. Given the ambush of the cab driver in a secluded location, however, with at least two of the three defendants armed, the nature of the crime shows defendants were aware of the dangers. Further, Moody knew the .38/.45 gang gun had a propensity to shoot, and Moody and Perez knew the gang gun was kept at Hernandez's apartment.

(4) *Defendant's presence at the scene of the killing, whether defendant was in a position to facilitate or prevent the actual murder or played a particular role in the death.* Moody and Perez were present during the entire duration of the offense. Both Moody and Vargas were inside the taxi cab, and a .45 bullet casing was found inside the cab; Perez was armed with a .22 rifle, and .22 bullet casings were found near the driver's side door. On the other hand, both Moody and Perez had an opportunity to de-escalate the crime after Vargas's first shot hit the cab driver in the leg. They did not use this opportunity.

(5) *Defendant's action or inaction played a role in the death.* Defendants affirmatively participated in the ambush, beating, and robbery of the cab driver. They did nothing to prevent Vargas from firing a second shot.

(6) *Defendant's rendering of aid or calling for help.* Neither Moody nor Perez did anything to help the cab driver. Instead, they left him for dead in the street.

(7) *Duration of the offense.* Although defendants assert the crime took between two to four minutes, this short duration was likely the result of the killing of the cab driver. Once Paz was dead and defendants took his money, there was nothing further to accomplish to further their plan except their escape from the scene.

(8) *Defendant's age*. Both Moody and Perez were under the age of 21 at the time of the offense, and although youth is a factor to consider in determining reckless indifference, there is nothing to show that these defendants acted out of rashness or impulse. Rather, the offense was planned in advance: a cab driver was chosen as the victim; he was lured to a remote location; the defendants each played a role in the robbery; and they attempted to cover up the gunshots with firecrackers.

## II. ADMISSION OF MOODY'S STATEMENTS AGAINST VARGAS AND PEREZ.

Vargas and Perez argue the trial court erred in admitting Moody's jailhouse hearsay statements to the *Perkins* informant because Moody's self-serving statements did not qualify as declarations against interest. Perez asserts that even if admissible, the statements should have been redacted to exclude those portions inculpating them. We disagree.

### A. Factual Background.

Moody declined to testify at trial by exercising his Fifth Amendment right, rendering him unavailable as a witness.

At a pretrial hearing, Vargas objected to Moody's *Perkins* statements as inadmissible hearsay, arguing Moody's statements were not declarations against interest because Moody was shifting blame to Vargas and Perez.[11] The prosecution countered that Moody admitted a significant role in the offenses that would

---

11      At trial, Perez's counsel relied on section 4001.9, which provides that a *Perkins* operative can listen and can report on what he hears, but he cannot engage in any conduct designed to elicit information. Perez does not assert this argument on appeal, instead relying on Evidence Code section 1230.

23

make him guilty of murder; further, Moody was not blame-shifting because he was bragging about committing numerous robberies, including the robbery at issue in this case.

The trial court ruled that Moody's statements were admissible against Vargas because they were "sufficiently against . . . [Moody's] interests to make them otherwise trustworthy as required by law[.]" The complete recording of Moody's statements to the *Perkins* agent was played for Vargas's jury. A shorter version was played for Moody and Perez's jury.[12]

## B. The Trial Court Did Not Abuse Its Discretion in Admitting Moody's Statements to the *Perkins* Agent.

A declaration against interest is an exception to the hearsay rule and permits the admission of any statement that "when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true." (Evid. Code, § 1230.) The rationale underlying this exception is that "a person's interest against being criminally implicated gives reasonable assurance of the veracity of his statement made against that interest," thereby mitigating the dangers usually associated with the admission of out-of-court statements. (*People v. Spriggs* (1964) 60 Cal.2d 868, 874.)

---

12    The transcript and recording were redacted to remove references to unrelated crimes committed by Moody.

To benefit from the exception of Evidence Code section 1230, the proponent must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made, and that the declaration was sufficiently reliable to warrant admission despite its hearsay character. (*People v. Grimes* (2016) 1 Cal.5th 698, 711.) In evaluating whether a statement is against the declarant's interest within the meaning of Evidence Code section 1230, and hence is sufficiently trustworthy to be admissible, the court may consider not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant. (*Ibid.*) We review a court's admission of hearsay evidence under Evidence Code section 1230 for an abuse of discretion. (*Ibid.*)

With respect to the requirement that the statement be against the declarant's interest, only those statements that are directly and specifically disserving to the declarant's penal interests are admissible. (*People v. Vasquez* (2012) 205 Cal.App.4th 609, 621.) As explained in *People v. Duarte* (2000) 24 Cal.4th 603, a hearsay statement may be facially inculpatory or neutral, but this feature cannot always be relied upon "to indicate whether it is 'truly self-inculpatory, rather than merely [an] attempt[ ] to shift blame or curry favor.'" (*Id.* at pp. 611–612.) In *People v. Smith* (2017) 12 Cal.App.5th 766, 792 (*Smith*), the court observed that "the fact a hearsay statement portrays the declarant as a more minimal participant in a crime by itself does not require exclusion or end our analysis." As a result, only when there is both blame shifting by the declarant and other circumstances suggesting some improper motive for the blame

25

shifting do courts find admission of a hearsay statement against penal interest in error. (*Ibid.*)

Finally, as trustworthiness is key, *People v. Greenberger* (1997) 58 Cal.App.4th 298, explained "[c]learly the least reliable circumstance is one in which the declarant has been arrested and attempts to improve his situation with the police by deflecting criminal responsibility onto others. . . . However, the most reliable circumstance is one in which the conversation occurs between friends in a noncoercive setting that fosters uninhibited disclosures." (*Id.* at p. 335.) Further, "[w]hen examining what was actually said by the declarant special attention must be paid to any statements that tend to inculpate the nondeclarant. . . . [A] statement's content is most reliable in that portion which inculpates the declarant [and i]t is least reliable in that portion which shifts responsibility." (*Ibid.*) However, a statement that incriminates the declarant but also inculpates a nondeclarant can be specifically disserving of the declarant's penal interest. (*Ibid.*) This determination relies upon a careful analysis of what was said and the totality of the circumstances. (*Ibid.;* see also *People v. Wilson* (1993) 17 Cal.App.4th 271, 276 [fact that the statement is also disserving to nondeclarant does not render the statement unreliable and inadmissible].)

A remedy for the mixed nature of some statements—those that are part inculpatory and part self-serving, is redaction. In *People v. Gallardo* (2017) 18 Cal.App.5th 51 (*Gallardo*), upon which Perez and Vargas rely, the declarant incriminated two co-defendants as participants in a shooting. (*Id.* at p. 72) The defendant claimed his confederates were the shooters, and that he waited around the corner in a getaway car. (*Id.* at p. 73.) The

26

trial court admitted the entire 40-page transcript of the defendant's jailhouse confession and did not "independently assess whether each statement" implicating the defendants was against the declarant's penal interest at the time he made it. (*Id.* at p. 72.) The court found "certain details [the declarant] had provided to the informants regarding the crime (including his identification of [one of the defendants] as the shooter, his description of the vehicles used and the route they drove) showed his entire statement was sufficiently trustworthy to warrant its inclusion as a declaration against interest." (*Ibid.*)

*Gallardo* concluded some of the statements were too self-serving and unreliable to qualify as declarations against interest because although the declarant admitted his participation, he placed the major responsibility for the offense on his co-defendants. (*Gallardo, supra*, 18 Cal.App.5th at p. 74.) *Gallardo* held admission of the entire transcript constituted prejudicial error and, in anticipation of a retrial, directed the trial court to "conduct an individualized inquiry to determine whether each statement the prosecution seeks to admit was sufficiently against" the declarant's interest to warrant admission under Evidence Code section 1230. (*Id.* at p. 77.)

Here, we conclude the trial court did not abuse its discretion by admitting Moody's statements without redaction. Analyzed in context, Moody's statements were admissible as declarations against interest because they were of such a nature that a reasonable person in his position would not have made the statements unless he believed them to be true. Moody asserted to the *Perkins* operative that he had an active role in the robbery: he joined with the other defendants in preparing for the crime; gave his .38 caliber gun to Vargas; directed Vargas to knock out

27

the taxi driver; went through the driver's pockets and took his wallet, phone, and money; threatened the driver with harm; lit fireworks to distract from the gunfire; and divided the spoils after the crime with Perez and Vargas. All of these statements are disserving of Moody.

Nonetheless, Perez asserts that Moody's statements were unreliable because he improperly shifted blame to one or more accomplices and minimized Moody's own role. Specifically, Perez emphasizes Moody stated he had no role in the planning of the robbery and was unarmed; Vargas initiated the robbery; Moody attempted to save the driver by telling Vargas not to shoot him; and Moody's statements contradicted Mesta's claim that Moody had a .22 caliber handgun, a fact which was corroborated by the shell casings at the scene. Vargas similarly argues that Moody described himself as "calm" about the situation, with the plan only to rob the taxi driver, but "fool" Vargas shot the driver and snitched on him. Vargas contends these statements place too much blame on Vargas to be reliable.

However, as both Perez and Vargas recognize, mixed inculpatory and exculpatory statements must be analyzed in context. (*People v. Lawley* (2002) 27 Cal.4th 102, 153 (*Lawley*).) Moody believed he was speaking to a gang member, and he thus had no motivation to exaggerate Vargas's or Perez's participation because he did not believe the *Perkins* operative had the ability to obtain more lenient treatment for him. Furthermore, Moody's statements comported with the evidence and Vargas's own statements.

These facts distinguish defendants' case from *People v. Duarte, supra,* 24 Cal.4th 603, where the declarant's statements were made to police, and he thus had motivation to make

28

exculpatory statements—"they unmistakably . . . were 'attempts to shift blame or curry favor.'"(*Id.* at p. 615.) Similarly, *People v. Lawley, supra,* 27 Cal.4th 102, is distinguishable. There, the defendant proffered hearsay in which the declarant (a gang member) took responsibility for the murder at issue and also asserted he had been ordered to do so by the Aryan Brotherhood. (*Id.* at p. 152.) *Lawley* concluded the trial court properly admitted the declarant's confession to the murder, but excluded the latter portion of the statement as not being against the declarant's interest because the declarant's naming of the Aryan Brotherhood was not specifically disserving of his interest. (*Ibid.*)

Having concluded the trial court did not abuse its discretion in admitting Moody's statements, we do not consider the argument that redaction was required. In any event, neither Vargas nor Perez was prejudiced by the admission of Moody's statement. (*Gallardo, supra,* 18 Cal.App.5th at p. 76.) Vargas told the police he shot and pistol-whipped the victim. Mesta testified Perez had a rifle consistent with the .22 shell cases found near the driver's side door of the taxi, and the video surveillance was consistent with Perez concealing a rifle.

## III.  VARGAS'S CONFESSION WAS NOT OBTAINED THROUGH COERCION OR DECEPTION.

Vargas contends his confession, obtained after he was placed in a cell with a *Perkins* agent, was involuntary and violated his Fifth and Fourteenth Amendment rights because it was coerced and obtained by the deceptive means of a *Perkins* agent. Respondent contends this argument was forfeited because Vargas's motion to exclude was based on the alleged lack of *Miranda* warnings during the *Perkins* operation, not the involuntariness of his later confession; in any event, Vargas has

29

not demonstrated that the use of the *Perkins* operation resulted in an involuntary confession.

## A. Factual Background.

### 1. *Interviews and* Perkins *Operation.*

During his first interview with police on March 15, 2016, Vargas claimed Mesta used his cell phone to call the taxi.

The evening after his arrest on May 17, 2016, Vargas was placed in a cell with a *Perkins* agent. Vargas's conversation with the *Perkins* agent was recorded.

The *Perkins* agent asked Vargas why he had been arrested. Vargas responded, "some [expletive] some other fools did . . . they used my phone, fool, to call some taxi" and they "smoked [the taxi driver]." The agent told Vargas the agent was in jail for attempted murder.

Although Vargas stated the police "pretty much . . . got me," because they knew his cell phone had been used in connection with the murder of a taxi driver, Vargas told the agent he was not going to say anything to the police. The agent told Vargas the police would not charge him unless they had evidence putting him at the crime scene, such as DNA, fingerprints, or security cam footage. After Vargas told the agent Moody had been arrested, the agent told Vargas that someone had been talking to the police. Further, the agent contended the police had put Vargas in jail because they had something on him and they would not have rearrested Vargas otherwise.

A detective came to the cell and told Vargas that he would be interviewed and that he had already talked to Moody and Perez. Afterwards, the agent told Vargas that it was likely the

30

police had discovered Vargas's alibi did not hold up, particularly if someone had talked.

Vargas told the agent he was not at the crime scene, but the agent responded that although often "homies" would claim they were not at the crime scene, the police would have evidence they had been there. The agent asked Vargas what he did. Vargas said he pistol-whipped the driver. The agent opined someone had "rolled" and thus Vargas should not be stuck on his claim that he was not at the crime scene.

Vargas sat in the back, while Moody sat in the front of the taxi. After the *Perkins* agent informed Vargas that taxis had a security camera on the rearview mirror, Vargas remarked that he was "fucked." The agent suggested that although the shooting might have been accidental, it was still murder, but if manslaughter the sentence would be nine or ten years.

The agent suggested that a better strategy was for Vargas to tell the police the shooting was accidental because the co-defendants were talking to the police. Unless Vargas came up with a story for the police, he would be spending life in prison on a murder charge. The agent said he believed Vargas had a chance to save himself. However, the agent opined if Vargas did not speak to police, it was likely they would charge him with "straight murder."

After Vargas's conversation with the *Perkins* agent, police interviewed Vargas. Vargas was advised of his *Miranda* rights but did not invoke his right to remain silent. Police told Vargas they had been speaking to people, and "we pretty much know exactly what happened. This is your opportunity to explain what happened out there."

In the second interview, Vargas told police that he had known Perez for "a couple of weeks." He did not know Moody. Mesta introduced him to Perez and Moody. Vargas had only been to Perez's apartment twice. The night of the offense, there were four of them at the apartment—Mesta, Moody, Perez, and Vargas. They had a discussion about robbing a taxi driver. Mesta called a taxi company using Vargas's phone. When they left the apartment, Perez concealed the weapon with his sweater.

Vargas went with Moody and Perez to meet the cab. Moody pulled out a gun and took the driver's money. Perez, who had a rifle that looked like an M16 with .22 caliber bullets, was standing over the driver on the driver's side.

After Vargas hit the driver in the back of the head with the gun, it accidentally went off. Someone told the cab driver to get out of the vehicle and he was walking in front of it. Moody hit the taxi driver. While the driver was on the ground, Vargas hit him again and the gun went off again. Perez threw some firecrackers around.

### 2.  *In Limine Trial Court Motion to Exclude.*

Before trial, Vargas moved to exclude the statements made during the *Perkins* operation and his subsequent statements to police. Vargas argued that his confession to the *Perkins* operative tainted his subsequent police interview because the operative advised Vargas not to exercise his right to remain silent but to tell police the shooting was accidental. Otherwise, Vargas would be charged with murder. As a result, his confession was the result of coercion and was involuntary.

The prosecution advised the court it did not intend to introduce Vargas's *Perkins* statements at trial. Further, there was nothing coercive in Vargas's conversation with the operative

32

because he was talking to someone he believed was helpful, and in any event, Vargas was *Mirandized* by police before making any statements.

The trial court denied the motion to exclude, holding that *People v. Orozco* (2019) 32 Cal.App.5th 802 (*Orozco*) and other cases had consistently held that a *Perkins* operation is not a coercive environment and hence no *Miranda* warnings are required.

## B. Discussion.

### 1. Standard of Review.

"In reviewing the trial court's ruling on a claimed *Miranda* violation, "'we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We independently determine from [those facts] whether the challenged statements were illegally obtained.""" (*People v. Elizalde* (2015) 61 Cal.4th 523, 530.) If an interview is recorded and the facts surrounding the admission are undisputed, we apply independent review. (*People v. Leon* (2020) 8 Cal.5th 831, 843.) We do not express any view on whether we endorse or condemn the particular interrogation techniques employed in this case; instead, our role is to determine whether those techniques comport with constitutional standards as articulated in guiding precedent.

### 2. The Issue Was Not Forfeited.

As a threshold issue, the People assert Vargas forfeited the issue in the trial court by failing to raise the precise grounds raised on appeal, namely, that his confession was involuntary. Vargas argued at trial that no *Miranda* warnings were given

during the *Perkins* operation, and that his *Perkins* statement and police interview were coerced. (See, e.g., *People v. Polk* (2010) 190 Cal.App.4th 1183, 1194–1195.) In response, Vargas asserts that if trial counsel failed to preserve the issue, counsel was ineffective for doing so.

Here, we find no forfeiture and thus need not consider whether Vargas's counsel was ineffective. Forfeiture results when a party fails to preserve a claim by raising a timely objection. (*Quigley v. Garden Valley Fire Protection Dist.* (2019) 7 Cal.5th 798, 805, fn. 4.) Respondent's argument that Vargas did not raise the issue below reads the *Miranda* voluntariness requirement too narrowly and draws a distinction that does not exist. A coerced confession is not voluntary. (See, e.g., *People v. McCurdy* (2014) 59 Cal.4th 1063, 1086.) Vargas's argument in the trial court asserted that his confession was effectively coerced by the *Perkins* operative's urging to speak up and claim the shooting was accidental. Coercion is an element of the voluntariness inquiry. Vargas's assertion sufficiently encompassed his *Miranda* argument being raised on appeal that his confession was involuntary.

### 3. *Vargas's Confession Was Voluntary.*

"To safeguard a suspect's Fifth Amendment privilege against self-incrimination,'" a custodial interrogation must be preceded by *Miranda* warnings and by the suspect's knowing and intelligent waiver of them. (*People v. Leon, supra*, 8 Cal.5th at pp. 842–843.) A statement obtained in violation of a suspect's *Miranda* rights may not be admitted to establish guilt in the prosecution's case-in-chief. (*People v. Elizalde, supra*, 61 Cal.4th at pp. 531–532; *People v. Krebs* (2019) 8 Cal.5th 265, 299.)

A waiver of *Miranda* rights must be voluntary. "To establish a valid *Miranda* waiver, the prosecution bears the burden of establishing by a preponderance of the evidence that the waiver was knowing, intelligent, and voluntary under the totality of the circumstances of the interrogation." (*People v. Linton* (2013) 56 Cal.4th 1146, 1171.) "As well, '[b]oth the state and federal Constitutions bar the prosecution from introducing a defendant's involuntary confession into evidence at trial.' [Citations.] As with *Miranda* waivers, the People bear the burden of establishing by a preponderance of the evidence the voluntariness of a confession." (*People v. Duff* (2014) 58 Cal.4th 527, 551.)

The waiver must be voluntary as the product of a free and deliberate choice rather than intimidation, coercion, or deception, and knowing in the sense that it was made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. (*People v. McCurdy, supra,* 59 Cal.4th at p. 1086.) The test of voluntariness considers several factors, including any element of police coercion, the length of the interrogation and its location and continuity, and the defendant's maturity, education, and physical and mental health. (*People v. Suarez* (2020) 10 Cal.5th 116, 157.) "The determinative question "'is whether defendant's choice to confess was not 'essentially free' because his will was overborne.'"" (*People v. Peoples* (2016) 62 Cal.4th 718, 740.)

Here, Vargas argues that the police interview benefitted from the deception of the *Perkins* operation, and although *Perkins* permits undercover police operations, it does not condone trickery or deception to obtain a waiver of *Miranda* rights. In making this argument, Vargas relies on *People v. Reyes* (2000) 83 Cal.App.4th

7 (*Reyes*), where police told a suspect they had backed into his car to induce him to leave his house. (*Id.* at p. 9) A search of the suspect yielded controlled substances. (*Ibid.*) *Reyes* found the search unconstitutional because the trickery undermined the voluntariness of the suspect's consent. (*Id.* at p. 13.)

We reject Vargas's attempt to analogize the deception of a *Perkins* operation to a Fourth Amendment search and seizure violation based on trickery. In *Reyes, supra,* 83 Cal.App.4th 7, consent was obtained under false pretenses, thereby undermining its validity. (*Id.* at p. 13.) Vargas's analogy fails on a basic level: consent is an element of the defense to a Fourth Amendment violation, while *Miranda* warnings are not an element underpinning the validity of a *Perkins* operation. Indeed, as *Orozco* made clear, *Miranda* does not apply to a *Perkins* operation, because implicit in the definition of "interrogation" is the suspect's awareness of police participation in the questioning. (*Orozco, supra,* 32 Cal.App.5th at pp. 811, 813-814.)

Further, any trickery does not automatically equate with the coercion present in a custodial interrogation such that *Miranda* is implicated when the defendant, after he speaks to a *Perkins* informant, later confesses to police. "*Miranda* does not protect suspects when they describe criminal activities to people they think are cellmates. [Citation.] Rather, *Miranda* addressed concerns that a 'police-dominated atmosphere' generates 'inherently compelling pressures' that 'undermine the individual's will to resist' questioning. [Citations.] Those concerns evaporate when, as here, an inmate speaks freely to someone he believes is a fellow inmate." (*People v. Rodriguez* (2019) 40 Cal.App.5th 194, 198.) *People v. Webb* (1993) 6 Cal.4th 494 observed that coercion is determined from the perspective of the

suspect, and in a *Perkins* operation, the suspect believed he was speaking to a friend. (*Id.* at p. 526.)

In the present case, the *Perkins* operative told Vargas he should speak to police because to remain silent would mean a harsher charge or sentence. These words, however, do not amount to coercion by police sufficient to implicate the voluntariness requirement of *Miranda.* Vargas believed he was speaking to someone with valuable knowledge and experience in dealing with police, rather than the police or their agent. Any compulsion Vargas felt to speak to police arose from Vargas's own decision to follow the operative's suggestions.

In any event, any error in admission of Vargas's confession is harmless. The erroneous admission of statements obtained in violation of the Fifth Amendment is reviewed for prejudice under the standard of *Chapman v. California* (1967) 386 U.S. 18 [87 S.Ct. 824, 17 L.Ed.2d 705]. (*People v. Henderson* (2020) 9 Cal.5th 1013, 1029.) That test requires the prosecution "'to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" (*Ibid.*)

In this case, compelling evidence that Vargas shot the taxi driver was before the jury even without considering the challenged statements in his interview with police. Mesta testified that Vargas had the .45 caliber gun; Moody stated during his *Perkins* operation that Vargas had hit the driver twice with the weapon and the gun had gone off accidentally, killing the driver.

## IV.   INSTRUCTIONAL ERROR.

### A.   No prejudice arising from outdated CALCRIM No. 301 instruction.

Moody contends the trial court erred in giving an outdated version of CALCRIM No. 301 on corroboration of accomplice testimony. Moody contends the accomplice corroboration rule only applies to testimony that tends to incriminate the defendant; as a result, CALCRIM No. 301 operated to preclude the jury from considering the exculpatory testimony of Mesta. We disagree.

#### 1.   *Factual Background: Revision of No. 301 and Smith, supra 12 Cal.App.5th 766.*

*Smith, supra,* 12 Cal.App.5th at pp. 777–778, stated "a jury may not *convict* a defendant of an offense based on accomplice testimony without corroborating evidence. [However, t]here is no corroboration requirement with respect to exculpatory accomplice testimony." (Original italics.) *Smith* reasoned that exculpatory testimony, by definition, cannot be said to support a conviction and, thus, need not be corroborated. (*Id.* at p. 780.)

CALCRIM No. 301, revised in March 2019, reads: "[Unless I instruct you otherwise,] (The/the) testimony of only one witness can prove any fact. Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence." The Bench Notes to the instruction state that corroboration is not required for exculpatory accomplice testimony, citing *Smith, supra,* 12 Cal.App.5th 766.

However, the trial court instructed the jury in December 2019 with an outdated version of CALCRIM No. 301: "Except for the testimony of an accomplice which requires supporting evidence if you decide that witness is an accomplice, the

38

testimony of only one witness can prove any fact. Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence."

Jurors were also given CALCRIM No. 334, which instructed them in relevant part that if they found Mesta to be an accomplice, "then you may not convict the defendant of the crimes charged based on his or her statement or testimony alone."

### 2. *Analysis.*

We apply a de novo standard of review in assessing whether instructions correctly state the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) Whether an instruction is clear and unambiguous is not the standard for determining error, however. A single instruction to a jury may not be judged in artificial isolation but must be viewed in the context of the overall charge. (*People v. Huggins* (2006) 38 Cal.4th 175, 192.) In making this determination, we review the allegedly erroneous instruction in the context of the evidence presented at trial, and we give the instructions a reasonable, rather than a technical, meaning. (*People v. Martinez* (2019) 34 Cal.App.5th 721, 728.) We also consider the arguments of counsel in assessing the probable impact of the instruction on the jury (*People v. Young* (2005) 34 Cal.4th 1149, 1202), and "'we must assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.'" (*People v. Richardson* (2008) 43 Cal.4th 959, 1028.)

Section 1111 provides in relevant part that "[a] conviction can not be had upon the testimony of an accomplice unless it [is] corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense[.]" This requirement of corroboration is an exception to the substantial

39

evidence rule and is based on the Legislature's determination that such testimony is, by itself, insufficient as a matter of law to support a conviction, due to the reliability questions posed by accomplice testimony. (*People v. Romero and Self* (2015) 62 Cal.4th 1, 32.) When an accomplice testifies as a witness for the People, the evidence is seen as coming from a source tainted by the accomplice's participation in the crime and because he or she often is testifying in the hope of favor or expectation of immunity. (*People v. Fowler* (1987) 196 Cal.App.3d 79, 86.) Where a witness testifies for a defendant, however, "the rationale underlying the cautionary instruction no longer applies" because an accomplice does not usually stand to benefit from providing testimony for the defense and so his or her statements are not necessarily suspect. (*Id.* at p. 87; *People v. Guiuan* (1998) 18 Cal.4th 558, 567.)

Under *Smith,* "[e]xculpatory testimony, by definition, cannot be said to support a conviction and, thus, need *not* be corroborated." (*Smith, supra*, 12 Cal.App.5th at p. 780, original italics.) In *Smith*, the court concluded the instructional error was prejudicial because "it [was] clear" the accomplice testimony did exculpate the defendant. (*Id.* at p. 781.) Further, the erroneous instruction "became a point of disagreement between a lone hold-out juror and the other 11 jurors," and the hold-out juror was eventually dismissed "in part because the other jurors believed that this juror was unwilling to follow the court's erroneous instruction regarding the need for corroboration of *any* accomplice testimony, regardless of whether that testimony was inculpatory or exculpatory." (*Ibid*, original italics.)

We agree that the version of CALCRIM No. 301 the trial court gave the jury was incorrect because it was unclear whether exculpatory evidence required corroboration. CALCRIM No. 334

40

did not cure the problem because while the inference may be drawn from the instruction that exculpatory evidence does not require corroboration, the more obvious and direct inference is that all accomplice testimony requires corroboration.

We conclude, however, that no prejudice resulted from the instruction. Moody asserts there was prejudice flowing from the erroneous instruction because Mesta's testimony that Mesta provided the .45 gun to Vargas contradicted Moody's statement to the undercover *Perkins* agent that Moody gave Vargas a .38 caliber gun. Accordingly, Moody argues, Mesta's testimony was exculpatory because it shows Moody did not have a role in supplying lethal weapons in the robbery. While Mesta's testimony may have been exculpatory, as discussed above, other evidence at trial regarding Moody's participation in the robbery and murder was substantial. This evidence included Moody's statements at the apartment after the robbery that they had shot the cab driver and obtained some money; surveillance video showing Moody and the others leaving the apartment before the offense and returning afterwards; and Moody's statements to the *Perkins* agent describing the robbery in detail. Thus, any error arising from the jury's inability to consider Mesta's testimony would likely not have changed the result at trial. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

Moody also asserts that Mesta's testimony was exculpatory with respect to the gang enhancements because Mesta believed defendants were discussing committing a robbery for their own benefit, not for the Choppers 12 gang; Mesta did not receive any money from the robbery, and Mesta did not know if any of the Choppers 12 gang members received any money. We need not

41

consider this issue as we conclude the gang enhancements must be retried as discussed in section V, *post*.

**C. No Error in Failing to Give Pinpoint Instruction on Reckless Indifference to Human Life**

Perez, joined by Moody, argues that the trial court's failure to give Perez's two proffered pinpoint instructions on "reckless indifference" constituted prejudicial error. Further, he argues the court's instruction on reckless indifference misstated the law. We disagree.

*1. Refusal to Give Pinpoint Instruction.*

(a) Factual Background.

The trial court instructed the jury on felony murder with CALCRIM No. 703 in relevant part: "A person acts with reckless indifference to human life when he knowingly engages in criminal activity that he knows involves a grave risk of death. [¶] . . . Among the factors you may consider are: [¶] (1) Knowledge of weapons and use and number of weapons; [¶] (2) Physical presence at the crime and opportunity to restrain the crime and/or aid the victim; [¶] (3) duration of the felony; [¶] (4) defendant's knowledge of a cohort's likelihood of killing; and [¶] (5) defendant's effort to minimize the risk of violence during the felony."

On the reckless indifference element, the jury was instructed with CALCRIM No. 540B,[13] which stated "When you

---

13    The court gave two versions of CALCRIM No. 540. The first, 540A, applied to Vargas as the actual shooter and the second, 540B, applied to Perez and Moody as aider and abettors.

decide whether the defendant acted with reckless indifference of human life, consider all of the evidence. Among the factors that you may consider are: [¶] 1. Knowledge of weapons and use and number of weapons; [¶] 2. Physical presence at the crime and opportunity to restrain the crime and/or aid the victim; [¶] 3. Duration of the felony; [¶] 4. Defendant's knowledge of cohort's likelihood of killing; and [¶] 5. Defendant's efforts to minimize the risks of violence during the felony. [¶] No one of these factors is necessary, nor is any one of them necessarily enough, to determine whether a defendant acted with reckless indifference to life."

Perez proffered two special pinpoint instructions dealing with reckless indifference. Special Instruction No. 2 stated, "Knowledge of the possible risk of death inherent in certain felonies—like armed robbery—and knowledge that confederates are armed is insufficient alone to show a reckless indifference to human life." Special Instruction No. 5 stated, "Awareness that a gun will be used in the felony is not sufficient to establish reckless indifference to human life."

The trial court stated, "I do believe that CALCRIMS cover everything, and the CALCRIM 540 series has been modified recently to take into account the changes in the law in this particular area." Perez's counsel responded, "the reason I want these in—I don't think that these two statements, which are the law, are found anywhere in the instructions—in the CALCRIM instructions. . . . [B]ased upon my conversations with the prosecution, . . . I think the prosecution intends to argue that [Perez] had a gun; he knew that other people had a gun, and,

---

The court noted it had included the most recent case law in CALCRIM No. 540B.

43

therefore, it was reckless indifference. [¶] . . . When I talk—I talk to people about my cases when I go to parties and stuff, [everyone always asks] 'hey what case do you have now?' And I tell them about the case. And I find a surprisingly large number of people believe inherently that, well, if he had a gun, that is all I need to know; that he is guilty of whatever happened. And that is just not the law."

The prosecution responded, "I understand that's what counsel anticipates me arguing. [However,] [t]hat is [not what] I will be arguing, that that sole factor alone constitutes a reckless indifference or being a major participant. [¶] . . . [¶] . . . I believe that the instructions clearly explain what the current state of the law is under *Banks* and more recently under *Clark*, and I will abide by that."

The trial court refused both special pinpoint instructions, explaining: "I think that the law is pretty clear that someone whose liability lies as an aider and abettor has to have very specific intent with regard to aiding and abetting and also being a major participant when it comes to a felony murder, and, obviously, there's elements and factors to consider to be a major participant, which would certainly require more than does he possess a gun and be at the scene. So I don't think that the instructions here give way to an inference that simply because he supplied a gun or was present at the scene by itself is sufficient [¶] . . . . [¶] It's a factor to consider when you look at it. So I think it becomes somewhat confusing. I think the [pattern] instruction[s] give both sides the ability to argue what they need to for the jurors. So the court is, over defense objection, not going to give the instructions."

(b)     Analysis

Pinpoint instructions "'relate particular facts to a legal issue in the case or "pinpoint" the crux of a defendant's case, such as mistaken identification or alibi. [Citation.] They are required to be given upon request when there is evidence supportive of the theory, but they are not required to be given sua sponte.'" (*People v. Hill* (2015) 236 Cal.App.4th 1100, 1118–1119.) "[O]n request, a criminal defendant is entitled to pinpoint instructions that relate particular facts to an element of the charged offense and highlight or explain a theory of the defense if the instructions are supported by substantial evidence." (*People v. Nelson* (2016) 1 Cal.5th 513, 542.)

However, the trial court "'need not give a pinpoint instruction if it is argumentative [citation], merely duplicates other instructions [citation], or is not supported by substantial evidence [citation].'" (*People v. Hartsch* (2010) 49 Cal.4th 472, 500.) An instruction is argumentative "when it recites facts drawn from the evidence in such a manner as to constitute argument to the jury in the guise of a statement of law" or when it "'''invite[s] the jury to draw inferences favorable to one of the parties from specified items of evidence.''''" (*People v. Campos* (2007) 156 Cal.App.4th 1228, 1244.) We review the trial court's decision on a pinpoint instruction de novo. (*People v. Brugman* (2021) 62 Cal.App.5th 608, 622, fn.3.)

Here, the CALCRIM instructions adequately instructed the jury that numerous factors, including whether a confederate was armed, were to be considered in evaluating whether the defendant acted with reckless indifference. Perez's proposed instructions were duplicative and might have confused the jury about the weight to be accorded the highlighted factor (use of a

gun) in relation to other factors. Further, the pinpoint instructions were argumentative in that they highlighted that gun use alone did not prove reckless indifference to life. Finally, the court permitted defense counsel to argue that, pursuant to the instructions, gun use alone is insufficient proof of reckless indifference to life.

Thus, Perez's claim of federal constitutional error is meritless because the standard instructions given by the trial court "adequately covered the same ground" as the requested instructions. (See *People v. Hovarter* (2008) 44 Cal.4th 983, 1022.)

> 2.  *CALCRIM 540B, the Instruction on Reckless Indifference, Did Not Misstate the Law by Permitting the Jury to Find Guilt Based on One Factor.*

> (a)  Factual Background.

Counsel for both Perez and Moody argued to the jury that no single factor could establish reckless disregard. Moody's counsel argued: "Any weapons used? Well, it's kind of common sense that if you use a gun, there's a likelihood—a possibility that someone will get killed. But using a gun in a robbery is not, you know, the end of the story. An armed robbery necessarily requires a gun to be used, at least, in terms of brandishing it. If, however you are there to commit a robbery and nothing more, that's all you are going to do. So, I mean, this really says nothing because everybody knows that guns pose a potential danger."

Perez's counsel argued: "'No one of these factors is necessary, nor is any one of them necessarily enough to determine whether the defendant was a major participant.' [¶] Now, let me tell you what that means, what that includes.

What that includes is this: Knowledge of the possible risk of death in certain felonies, like armed robbery, and knowledge that confederates are armed is insufficient alone to show a reckless indifference to human life."

Counsel further stated, "But, again, they left out the most important one. 'No one of these factors is necessary, nor is any one of them necessarily enough, to determine whether a defendant acted with reckless indifference to human life.' [¶] And that means—and that means that knowledge of the possible risk of death inherent in certain felonies like armed robbery and knowledge that confederates are armed is insufficient alone to show a reckless indifference to life. It also means that awareness that a gun will be used in a felony is not sufficient to establish reckless indifference to human life. [¶] And the mere fact that the defendant knew that his co-defendants were armed is insufficient to prove an awareness that his actions carry a grave risk of death."

(b)     Analysis.

Perez asserts the instruction on reckless indifference constitutes an incorrect statement of the law because it permitted the jury to find reckless indifference based on any single factor, such as gun use. In support of this contention, Perez asserts the other instructions in this case stated the same general principle that any particular factor is not necessarily sufficient but *may* be sufficient. (See, e.g., CALCRIM 316 (witness's prior conviction's effect on credibility); CALCRIM 332 (weight of expert testimony). Further, elsewhere, jurors were informed in instructions where a single factor was not sufficient, e.g., CALCRIM 372 (flight does not prove guilt by itself).

47

In reviewing a claim of instructional error, we must consider the jury instructions as a whole, and not judge a single jury instruction in artificial isolation out of the context of the charge and the entire trial record. We also consider the arguments of counsel in assessing the probable impact of the instructions on the jury. "'What is crucial . . . is the meaning that the instructions communicated to the jury. If that meaning was not objectionable, the instructions cannot be deemed erroneous.'" (*People v. Kumar* (2019) 39 Cal.App.5th 557, 564.) "'Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions.'" (*Ibid*.) We evaluate whether an instruction correctly states the law under a de novo standard. (*Id.* at p. 563.)

Here, CALCRIM No. 540B was proper and tracked the language of *Banks* and *Clark* setting forth the factors underlying reckless indifference. The instruction exhorts the jury to consider all factors and did not direct the jury's attention to any one factor nor permit the jury to rely on a single factor in evaluating reckless indifference to life. As the instruction stated, "[n]o one of these factors is necessary, nor is any one of them necessarily enough, to determine whether a defendant acted with reckless indifference to life." In sum, the instruction correctly identified all factors to be considered and did not emphasize one factor to the detriment of others. Defense counsel's arguments repeated and reiterated these points. Therefore, the unrelated instructions Perez cites could not have confused the jury such that it understood No. 540B to signify it should only consider a single factor, to the exclusion of others, to establish felony murder based on reckless indifference to life.

## V.    ENHANCEMENTS.

### A.    Gang Enhancements.

Perez, joined by Moody, argues that the trial court erred in admitting case-specific hearsay evidence on the predicate gang acts, in failing to give a unanimity instruction on the specific gang at issue and an instruction that the benefit to the gang must be more than reputational, and finally that under revised section 186.22, which applies retroactively, insufficient evidence supports those enhancements. Respondent posits that revised section 186.22 applies retroactively, and double jeopardy principles do not prohibit remand for retrial of the enhancements.

### 1.    *AB 333 Modified Section 186.22 to Require Additional Proof, Requiring Remand.*

In 2021, the Legislature enacted AB 333, which amended section 186.22 to impose new substantive and procedural requirements for gang allegations. (Assem. Bill No. 333 (2021-2022 Reg. Sess.) § 3.) AB 333 found "[g]ang enhancement evidence can be unreliable and prejudicial to a jury" because such evidence "is lumped into evidence of the underlying charges[,] further perpetuat[ing] . . . convictions of innocent people." (Stats. 2021, ch. 699, § 2(d)(6)); see *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1129.) Therefore, AB 333 modified the evidentiary standard for admission of gang evidence and provided for bifurcation of trials to separate the gang evidence from the underlying charges. The statute is silent about retroactivity. (*People v. Rodriguez* (2022) 75 Cal.App.5th 816, 822.)

The amendments to section 186.22 "require proof of additional elements to establish a gang enhancement." (*People v. Lopez* (2021) 73 Cal.App.5th 327, 343.) Among other things, AB

49

333 amended the definitions of "criminal street gang" (§ 186.22, subd. (f)) and "pattern of criminal gang activity" (§ 186.22, subd. (e)(1)), and clarified the evidence needed to establish that an offense benefits, promotes, furthers, or assists a criminal street gang. (See *People v. E.H.* (2022) 75 Cal.App.5th 467, 477–478.)

Most notably, the new law defines "to benefit, promote, further, or assist" as "to provide a common benefit to members of a gang where the common benefit is more than reputational. Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (§ 186.22, subd. (g).) In addition, the new law imposes a stricter requirement for proof of a predicate offense, namely "a pattern of criminal gang activity," which is necessary to prove that the group with which the defendant is associated is indeed a criminal street gang. (See § 186.22, subd. (f).) The current offense cannot be used as one of the two predicate offenses. (§ 186.22, subd. (e)(2).) Further, both predicate offenses must have been committed "within three years of the date the current offense is alleged to have been committed," by gang "members," and must have been for the "common[ ] benefit[ ] [of] a criminal street gang." (§ 186.22, subd. (e)(1).)

Thus, in summary, pursuant to the new legislation, imposition of a gang enhancement requires proof of the following additional requirements with respect to predicate offenses: (1) the offenses must have "commonly benefited a criminal street gang" where the "common benefit[ ] . . . is more than reputational"; (2) the last predicate offense must have occurred within three years of the date of the currently charged offense; (3) the

predicate offenses must be committed on separate occasions or by two or more gang members; and (4) the charged offense cannot be used as a predicate offense. (Assem. Bill No. 333 (2021-2022 Reg. Sess.) § 3, § 186.22, subd. (e)(1)–(2).)

Procedurally, new section 1109 provides that, upon the defendant's request, the trial court must bifurcate an enhancement charged under section 186.22, subdivision (b) or (d), from the underlying charges. (§ 1109, subd. (a).) In addition, such separate proceedings must be held after the determination of the defendant's guilt in the underlying offenses. (*Ibid*.)

Respondent concedes, and the parties do not dispute, the new section 186.22 applies retroactively to cases not yet final on appeal. (*People v. Lopez, supra,* 73 Cal.App.5th at p. 344.) The same standards apply to challenges to the evidence underlying a true finding on a special circumstance as to any other evidence. (*Edwards, supra,* 57 Cal.4th at p. 715.)

Perez and Moody argue the enhancements must be reversed because there was no evidence of any gang motivation in committing the offenses. Specifically, they argue, no gang directed them to commit the robbery; neither Vargas nor Moody was a member of a gang; the "gang" gun was not at the apartment for the purpose of the robbery; the offense was not committed in concert with members of the same gang; and there was no evidence of intent to benefit a gang because the only evidence suggested that the defendants intended to obtain money from the robbery.

We agree that there is insufficient evidence to support the gang allegations. The prosecution relied on four predicate offenses, two for each of Choppers 12 and Big Hazard. One Choppers 12 member was convicted of robbery and one Choppers

51

member was convicted of being a felon in possession of a firearm; and two Big Hazard members were convicted of being a felon in possession of a firearm. The gang allegations do not indicate whether the offenses benefitted the gang in a way that was more than reputational. Accordingly, the gang enhancements against Perez and Moody are vacated.

### 2. *Double Jeopardy.*

Moody and Perez argue that the double jeopardy clause prohibits retrial of these gang allegations. The double jeopardy clauses of the Fifth Amendment to the United States Constitution and article I, section 15, of the California Constitution provide that a person may not be twice placed "'in jeopardy'" for the "'same offense.'" (*People v. Monge* (1997) 16 Cal.4th 826, 831–832, 844.) The double jeopardy bar protects against a second prosecution for the same offense following an acquittal or conviction, and applies where a conviction is reversed or set aside because of insufficient evidence. (*Id.* at pp. 832 (conc. opn. of Brown, J.), 849, (dis. opn. of Werdegar).)

When a statutory amendment adds an additional element to an offense, however, the prosecution must be afforded the opportunity to establish the additional element upon remand. (*People v. Figueroa* (1993) 20 Cal.App.4th 65, 71.) The proper remedy for this type of failure of proof—where newly required elements were "never tried" to the jury—is to remand and give the People an opportunity to retry the affected charges. (*Id.* at pp. 71–72, fn. 2) Such a retrial is not barred by the double jeopardy clause because the issue was not relevant to the charges at the time of trial and accordingly, the question was never tried. (*Id.* at p. 72, fn.2) Hence, we reverse the gang enhancements and

remand the matter to the trial court for further proceedings. (*Id.* at p. 72.)

To the extent Perez and Moody argue remand is inappropriate because there is insufficient evidence in the trial record to prove the enhancements under the new law, they are mistaken. Where, as here, evidence is not introduced at trial because the law at that time would have rendered it irrelevant, remand to prove that element is proper. (See *People v. Balderas* (1985) 41 Cal.3d 144, 197–199 [retrial of special circumstances issue in death penalty trial after court decision that intent to kill was required for felony-murder special circumstance].)

Finally, Perez and Moody argue the failure to bifurcate the gang allegations under newly-enacted section 1109, which they contend applies retroactively, constitutes prejudicial error. We disagree.

Courts of Appeal are currently split regarding whether section 1109 applies retroactively to nonfinal judgments, and the Supreme Court declined to resolve the matter in *People v. Tran* (2022) 13 Cal.5th 1169, 1208.[14]

We need not decide the issue in this case. As one court has held, the *Watson* standard applies to the failure to bifurcate under section 1109. (*People v. E.H.*, *supra*, 75 Cal.App.5th at p. 480.) Thus, even if section 1109 applied retroactively to this case,

---

14      Compare *People v. Montano* (2022) 80 Cal.App.5th 82, 105-108 [§ 1109 applies retroactively]; *People v. Ramos, supra,* 77 Cal.App.5th at pp. 1128-1131 [same]; *People v. Burgos* (2022) 77 Cal.App.5th 550, 564-568, review granted July 13, 2022, S274743 [same], with *People v. Ramirez* (2022) 79 Cal.App.5th 48, 65, review granted August 17, 2022, S275341 [§ 1109 does not apply retroactively]; *People v. Perez* (2022) 78 Cal.App.5th 192, 207, review granted August 17, 2022, S275090 [same].

neither Moody nor Perez can show it is "'reasonably probable'" they would have obtained a more favorable result if their trial had been bifurcated. (*Ibid.* [applying *Watson* standard to evaluation of prejudice resulting from decision not to apply section 1109 retroactively].) Where, as here, the evidence of guilt on the relevant charges is "'overwhelming,'" it is unlikely Moody or Perez were harmed by the format of the trial. (*Ibid.; People v. Pinholster* (1992) 1 Cal.4th 865, 931, overruled on another ground in *People v. Williams* (2010) 49 Cal.4th 405, 459 [concluding the failure to bifurcate was harmless under the *Watson* standard because "[t]here was overwhelming evidence of defendant's guilt on the other charges"].) As discussed above, there was abundant evidence of guilt—Moody's inculpatory statements to police during the *Perkins* operation, and Perez's statements during police interviews.

As we conclude the matter must be remanded for a retrial of the gang allegations against Perez and Moody, we need not consider their arguments that the trial court erred in failing to give a unanimity instruction, committed instructional error with respect to whether the benefit to the gang must be more than reputational, or erred in admitting hearsay evidence on the specific gang at issue. (See, e.g., *People v. Thomas* (2021) 64 Cal.App.5th 924, 947.)

## B. Firearm Enhancements.

Perez, joined by Moody, argues that insufficient evidence supported the gang-principal firearm discharge enhancement under section 12022.53, subdivisions (b) through (e) because the only evidence at trial was that the gun fired accidentally. They also assert that the enhancements are not saved by Perez's use and discharge of a weapon because the pleadings failed to allege

54

this as a basis for the enhancements. As a result, they contend the firearm enhancements may not be retried under the double jeopardy clause. They also argue instructional error based on the court's failure to give an instruction that the benefit to the gang must be more than reputational. We find sufficient evidence supported the weapons enhancements based on intentional firing of the weapon, and as a result the enhancements can be retried under principles of double jeopardy.

### 1. *Factual Background.*

The amended information contained special allegations on count 1 as to Perez and Moody that a principal personally and intentionally discharged a firearm under section 12022.53, subdivisions (c), (d) and (e)(1). The information further alleged that Vargas personally and intentionally discharged a firearm under section 12022.53, subdivision (d).

Perez and Moody assert the undisputed evidence at trial showed that Vargas shot and killed Paz. However, with respect to Vargas's intent in doing so, Moody told the *Perkins* agent the gun Vargas used was prone to go off accidentally; Vargas told Mesta after the group returned to the apartment that the gun went off accidentally while he was pistol whipping the driver; Vargas told the police in his second interview that the gun went off accidentally when he was striking the cab driver; Moody told the *Perkins* agent that the gun went off accidentally when Vargas was hitting the cab driver. On the other hand, Mesta told a *Perkins* agent that he believed Vargas lied about the accidental discharge of the gun and that he believed Vargas intended to shoot Paz. The forensic evidence showed that Paz's head injuries consisted of abrasions and lacerations from blunt force trauma and the gun was fired from a distance of 12 inches.

55

## 2. *Analysis.*

Section 12022.53 requires that the principal intend to discharge the firearm. (*People v. Offley* (2020) 48 Cal.App.5th 588, 598.) Ordinarily, section 12022.53's sentence enhancements apply only to personal use or discharge of a firearm in the commission of a statutorily specified offense, but when the offense is committed to benefit a criminal street gang, the statute's additional punishments apply even if, as in this case, a defendant did not personally use or discharge a firearm but another principal did. (*People v. Brookfield* (2009) 47 Cal.4th 583, 589–590.) To impose the enhancement vicariously in this manner, the prosecution must show the defendant was a principal in the underlying crime and violated section 186.22, subdivision (b), and any principal in the offense committed any act listed in subdivisions (b) through (d) in section 12022.53. (*People v. Lee* (2022) 81 Cal.App.5th 232, 239 (*Lee*).) *Lee* held that where gang allegations are vacated under section 186.22 as amended by AB 333, related firearm enhancements based upon gang affiliation under section 12022.53, subds. (b)/(e)(1) through (d)/(e)(1) must also be vacated. (*Id.* at pp. 237, 240.)

Defendants' argument is based upon the accidental firing of the weapon, rather than the fact of gang affiliation under the now-vacated gang enhancements. Consequently, we find the enhancements are supported by substantial evidence at trial. We need not rely on Perez's use of a weapon to reach this conclusion. The jury was entitled to believe Mesta's assertion that Vargas intended to shoot the cab driver. (*People v. Duncan* (2008) 160 Cal.App.4th 1014, 1018 [testimony of one witness is sufficient to sustain a conviction].) As a result, we disregard Perez's arguments regarding testimony that the gun went off

accidentally because those arguments go to the weight, rather than the sufficiency, of the evidence. However, because the weapons enhancements were based on the now-vacated gang allegations, under *People v. Lee, supra,* 81 Cal.App.5th 232, we remand the matter along with the gang enhancements for retrial. As substantial evidence supports the imposition of the enhancement, retrial is not barred by double jeopardy.

## VI.    PROSECUTORIAL MISCONDUCT.

Perez, joined by Moody, argues the prosecutor committed misconduct by urging the jury to convict them based on their "moral guilt" as accomplices, thereby violating their due process rights to be convicted based upon the evidence. (See, e.g., *Victor v. Nebraska* (1994) 511 U.S. 1, 15 [114 S.Ct. 1239, 127 L.Ed.2 583] [jury might understand "moral certainty" to mean something less than the very high level of probability the Constitution requires in criminal cases].) Perez contends the error was prejudicial because the case was "close" and therefore it was likely the prosecution's argument caused one or more jurors to convict on a lesser standard of proof, and as Moody asserts, given the "reckless indifference" standard includes an element of moral culpability, it was likely the jury was confused. Finally, Perez contends the error was preserved although his trial counsel did not object because admonition would not have cured the improper argument; furthermore, even if objection was required, counsel was ineffective for failing to object. We conclude any references to moral culpability did not prejudice Perez or Moody.

### A.    Factual Background.

During closing argument, the prosecutor made several references to defendants' guilt on a vicarious liability theory by

57

using the word "moral" to describe their guilt. The prosecution stated, "even though [Moody and Perez] weren't the ones that pulled that final trigger, . . . they are just as liable, both morally and legally[;]" "[t]here's no way that these two men are not morally and legally liable for that man's death, not in this scenario[;]" and "[t]hey are both morally and, as you've seen, legally responsible for everything that happened."

Moody's counsel argued in closing that "there's a difference between morality and the law[,]" and "from a moral standpoint you could come to the conclusion, without too much thought, that these gentlemen are morally responsible. [¶] However, this is a court of law where there's a distinction between morality and the law. The law is the same for everyone. Morality is not necessarily the same. Under the law individuals are held responsible for the acts that they actually did and the consequences of those acts." Further, Moody's counsel argued, "[Y]ou are not here to make moral judgments, to make moral decisions. . . . Morality can vary from person to person, but the law is the law." Finally, Moody's counsel told the jury that "[s]o unless you can find beyond a reasonable doubt from the legal standpoint, not [morally], but legally that Moody did act with reckless indifference . . . ."

The prosecution also referred to moral guilt when addressing the standard of proof, stating "[t]he standard of proof here is proof beyond a reasonable doubt. And from the first day we met, the first day we spoke, I told you that is a high standard and it . . . 100 percent absolutely should be. And I ask each one of you to promise if we do not meet that standard, to acquit these men of these crimes because that is what a fair trial is to all parties and that is what your role is in this case. [¶] . . . . And the fair trial has shown well beyond a proof beyond a reasonable

doubt that these men are guilty, that they are responsible both morally and legally for the loss of that man's life."

### B. Any Reference to Moral Culpability Did Not Prejudice Perez or Moody.

The prosecution commits misconduct when his or her conduct either infects the trial with such unfairness as to render the subsequent conviction a denial of due process or involves deceptive or reprehensible methods employed to persuade the trier of fact. (*People v. Silveria and Travis* (2020) 10 Cal.5th 195, 306.) In general, a prosecutor is given wide latitude to vigorously argue his or her case and to make fair comment upon the evidence, including reasonable inferences or deductions that may be drawn from the evidence. (*People v. Fayed* (2020) 9 Cal.5th 147, 204.) Whether such inferences are reasonable is for the jury to decide. (*Ibid.*) However, counsel may not assume or state facts not in evidence or mischaracterize the evidence. (*Ibid.*)

Timely objection is required to preserve a claim: A defendant may not complain on appeal of prosecutorial misconduct unless in the trial court the defendant raised the issue and requested that the jury be admonished to disregard the impropriety. (*People v. Silveria and Travis, supra,* 10 Cal.5th at p. 306.) Failure to object will be excused only where objection is futile, or when an admonition would not have cured the misconduct. (*People v. Centeno* (2014) 60 Cal.4th 659, 674.)

In assessing prejudice, """the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.""" (*People v. Jackson* (2016) 1 Cal.5th 269, 349.) When attacking the prosecutor's remarks to the jury, the defendant must show that in the context of the whole argument and the instructions there

59

was "'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.'" (*People v. Centeno, supra,* 60 Cal.4th at p. 667.)

Here, Perez and Moody acknowledge they failed to object to the prosecution's "moral guilt" comments, and they did not request any jury admonishment. This results in a forfeiture of their claim. (*People v. Rivera* (2019) 7 Cal.5th 306, 334.) Further, they do not make any argument that admonishment would have been futile. (See *People v. Thomas*, *supra,* 64 Cal.App.5th at p. 955.)

Even assuming the error was preserved, defendants cannot show prejudice, namely, that there was a reasonable likelihood the jury applied the comments in an improper manner. (*People v. Caldwell* (2013) 212 Cal.App.4th 1262, 1269.) The prosecution, numerous times throughout closing argument, admonished the jury that the evidence and testimony, not defendants' moral culpability, established defendants' guilt. The prosecution stated, "you heard the evidence. You saw the evidence. You heard from the witnesses that got up here and talked to you about what happened. You saw the videos." "They are guilty of everything. They are guilty because that is what the evidence shows." "[W]e know from the evidence in this case, we know from the witnesses, we know from what we were told by the people who were involved in what happened . . . ."

Further, with respect to defendants' participation, the prosecution argued, "[w]ere they major participants in the robbery? You heard what they did. You saw the evidence. You heard from the witnesses . . . . "These two men are nothing if not major participants who acted in reckless indifference to human life. [Moody and Perez] are guilty of murder." Given this

emphasis on guilt based upon the evidence and testimony of witnesses, with only a brief reference to moral guilt, it is not reasonably likely the jury convicted defendants based upon an improper connection between "moral" culpability and legal culpability, or upon a belief they were people who committed reckless acts.

The jury instructions here further dispel any potential prejudice. (*People v. Dalton* (2019) 7 Cal.5th 166, 260.) The jury was instructed with CALCRIM No. 200, which admonished jurors to base their decision as factfinders "only on the evidence that has been presented to you in this trial," and admonished them to "follow the law." An instruction on reasonable doubt, CALCRIM No. 220, required the jury to consider "all the evidence" presented at trial. Given these instructions' focus on evidence, it is not likely that the jury found the defendants guilty solely on a "moral" basis.

Finally, given the lack of prejudice, defendants' ineffective assistance of counsel claim fails. Our holding that the prosecutor's error was harmless defeats defendants' substantive ineffective assistance claim because defendants have not shown that the result would have been different if trial counsel had requested and received a "curative" admonition. (See *People v. Bolin* (1998) 18 Cal.4th 297, 333 [ineffective assistance claim requires both deficient performance and resultant prejudice; "the record must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different'"].)

61

## VII. SENTENCING ISSUES.

### A. Recent Amendments to Section 1170

Vargas argues that the case must be remanded for resentencing on counts 4 and 5 because the trial court imposed the upper term, contrary to recent amendments to section 1170, effective January 1, 2022, which provide that the middle term is the presumptive term unless certain circumstances, not present here, exist. Respondent asserts that any error was harmless beyond a reasonable doubt.

#### 1. *Factual Background.*

Vargas was 18 years old at the time of the offenses. At the sentencing hearing, without specifying its reasons, the trial court sentenced him to the upper term on count 4 (carrying a loaded unregistered firearm). With respect to count 5 (robbery), the court imposed the upper term because the victim was particularly vulnerable (lured to an isolated area), the crime was extremely violent, and the crime showed planning and sophistication. The court stayed the sentence on count 5 pursuant to section 654.

#### 2. *Analysis.*

At the time Vargas was sentenced, the law in effect provided that where a statute specified three possible terms (lower, middle, and upper) of imprisonment, the trial court had broad discretion to select the term that best served the interests of justice. (Former § 1170, subd. (b); Former Cal. Rules of Court, rule 4.420(e); *People v. Sandoval* (2007) 41 Cal.4th 825,847.) Effective January 1, 2022, Senate Bill 567 (SB 567) altered the determinate sentencing law by amending section 1170, subdivision (b), to make the midterm the presumptive sentence in

62

the absence of specified circumstances. (Stats. 2021, ch. 731, § 1.3, adding § 1170, subd. (b)(1), (2); *People v. Flores* (2021) 73 Cal.App.5th 1032, 1038 (*Flores*).) The trial court may impose the upper term only where there are circumstances in aggravation and such circumstances have been found true beyond a reasonable doubt or are stipulated by the defendant. (§ 1170, subd. (b)(2); *People v. Falcon* (2023) 92 Cal.App.5th 911, 915.) The amendments to section 1170 apply retroactively. (*Flores, supra*, at p. 1039.)

Here, Vargas points to his youth at the time of the offenses (age 19) and contends, unless the aggravating circumstances outweigh the mitigating circumstances, the court should have ordered the lower term. (§ 1170, subd. (b)(6)(B).) Respondent argues any error was harmless because there was undisputed evidence of each of the aggravating circumstances (vulnerable victim, violence of crime, and sophistication) such that we could conclude, beyond a reasonable doubt, that the jury would have found an aggravating circumstance.

Courts are divided on the appropriate standard for demonstrating prejudice.[15] The primary disagreement is between *People v. Flores* (2022) 75 Cal.App.5th 495, and *People v. Lopez* (2022) 78 Cal.App.5th 459 (*Lopez*). *People v. Flores* required the reviewing court to find *at least a single* aggravating circumstance to conclude the error was harmless. (*People v. Flores, supra*, at p. 500–501.) By contrast, in *Lopez, supra*, the court adopted a more stringent test involving whether "beyond a reasonable doubt . . . a jury would have found true . . . *all* of the aggravating factors on

---

15      The issue is pending before the Supreme Court in *People v. Lynch* (May 27, 2022, C094174) [nonpub. opn.], review granted August 10, 2022, S274942.)

which the trial court relied in exercising its discretion to select the upper term" and a second-step evaluation of prejudice. (*Lopez, supra*, at p. 467, fn. 11, original italics.) However, in *People v. Dunn* (2022) 81 Cal.App.5th 394 (*Dunn*), review granted October 12, 2022, S275655, overruled on another ground in *People v. Falcon, supra,* 92 Cal.App.5th at p. 950, the court evaluated *People v. Flores* and *Lopez* and concluded that "[*People v.*] *Flores* sets too low a standard for harmlessness and *Lopez* too high." (*Dunn*, *supra*, 81 Cal.App.5th at p. 409.) Thus, *Dunn* adopted a test it described as a modification of *Lopez*.

Here, however, we conclude that the trial court's sentencing choices were harmless beyond a reasonable doubt, even under the more stringent *Lopez* standard. A jury undisputedly would find true all of the aggravating factors the court cited. The trial court based its upper term sentence on its finding that the victim was particularly vulnerable. The evidence showed that Paz was called out to an isolated, industrial area. Vargas's phone was used to call the taxi service. Further, the crime was extremely violent, with the evidence showing Paz was shot twice, once in the head and once in his leg, and had lacerations on and near his right ear consistent with blunt force injury. Vargas told the police that he hit Paz's neck with a gun. Finally, the planning and sophistication of the offenses is supported by the luring of the victim to an isolated area and the three defendants' assigned roles.

We conclude that had the jury been called upon to decide beyond a reasonable doubt whether these aggravating factors were true, it would have concluded they were.

## B. Recent Amendments to Section 654.

Vargas argues that remand is necessary for the trial court to exercise its new discretion under amended section 654. Respondent counters that although these amendments apply retroactively to Vargas, he cannot benefit from them because the record demonstrates beyond a reasonable doubt that the trial court would nonetheless have stayed the shorter, rather than the longer, sentence.

Previously, section 654, subdivision (a), required that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment[.]" Effective January 1, 2022, Assembly Bill 518 (AB 518) amended section 654 by removing the requirement that a defendant be punished under the provision providing for the longest term of imprisonment, and granting the trial court discretion to impose punishment under any applicable provision. (Stats. 2021, ch. 441, § 1.) Section 654, subdivision (a), now provides, "[a]n act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions[.]"

The parties do not dispute AB 518 applies retroactively. (*People v. Jones* (2022) 79 Cal.App.5th 37, 45; *People v. Mani* (2022) 74 Cal.App.5th 343, 379–380.)

Here, the trial court sentenced Vargas to life without parole plus 10 years on count 1 and stayed the shorter term on count 5 (five years plus 10 years). Vargas argues there is no basis to conclude the trial court would have refused to exercise its discretion by imposing only the shorter term. He points out that although the court found aggravating factors favored imposing

the high term on the robbery count, this does not imply that the court believed the interests of justice favored a life without parole sentence rather than a sentence of 15 years for an 18-year-old defendant who the jury determined did not intentionally discharge a firearm.

We disagree. Here, Vargas committed both a robbery and murder. Further, in sentencing Vargas, the court imposed the high term for both the robbery conviction and the conviction for carrying a loaded unregistered firearm. Given these sentencing choices, the matter need not be remanded for the court to exercise its new discretion under section 654. (See *People v. McVey* (2018) 24 Cal.App.5th 405, 418–419.)

### C. Moody's Custody Credits.

Moody contends he is entitled to two additional days of custody credit. Respondent concedes this point. The trial court gave Moody 1,642 actual days of presentence custody credit. However, 1,643 days elapsed from Moody's arrest on April 20, 2016, to his sentencing on October 19, 2020. Therefore, Moody's abstract of judgment must be amended to reflect 1,644 days of presentence custody credit.

## VIII. CUMULATIVE ERROR.

Moody and Vargas argue that the cumulative effect of the state law errors requires reversal. We have found no errors. The rejection of each of a defendant's individual claims "cannot logically be used to support a cumulative error claim [where] we have already found there was no error to cumulate." (*In re Reno* (2012) 55 Cal.4th 428, 483.)

66

## DISPOSITION

The judgment of conviction is affirmed as modified to correct Moody's custody credits. The gang and weapons enhancements are vacated and the matter is remanded for retrial of the gang and firearm enhancements. In all other respects, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


CURREY, P. J.

We concur:



COLLINS, J.



ZUKIN, J.